Good morning, your honors. Dr. Wilder created a lesson plan designed to help college professors better assess the effectiveness of their teaching in a field called numeracy. You might just imagine to give a presentation at a prestigious conference on learning assessment. She created a presentation that was designed to discuss how college professors better assess the effectiveness of their teaching in numeracy. She liked what Dr. Wilder had written, but rather than simply describe what Dr. Wilder had written or give an abstract of it or even take a few passages from it, she took wholesale two-thirds of Dr. Wilder's presentation and copied it word for word into her own presentation. When you say it's two-thirds of her presentation, it's two-thirds of Unit 7H? Yes. How much of the entire curriculum had Dr. Wilder written? Well, there were eight different units in the curriculum. I can't say how many pages there were, but Unit 7H was the bulk of Unit 7. Unit 7 was essentially the capstone. No, no, no. My question was how much of the rest of the curriculum had she written? That was my question. Yeah, I don't... Oh, had she written or that Dr. Hoiland borrowed? How much of the curriculum for Niche or Nice had Dr. Wilder written? I don't know the exact percentage, but it was a substantial portion of... More than half? Oh, yes, yes. I believe in the area... So I guess one of my questions is then why are we measuring the quantity of copyrighted material that was used by reference only to 7H? Is it your argument because that is the only portion that she actually registered a copyright for? That's right. And that's the word? Yes, yes. It would be the same thing if somebody had written, say, presented and written the songs or musical composition for an album and only one of the songs were borrowed. What if someone wrote a book and only registered a copyright for Chapter 7 out of 20? Well, in that case, I think there would only be a lawsuit about Chapter... That one particular chapter. And you're saying that we would ask... When asking how much was borrowed, if all of Chapter 7 was borrowed, you would say it's 100% of the author's material was copied? It was two-thirds of the author's material of Chapter 7 Unit 7H. No, no, no. I'm talking about my hypothetical where someone's written a 20-chapter book, only Chapter 7 was copied. Sure. And let's say Chapter 7 was... Let's just say Ballpark was 5% of the book. Sure. You would not say that 5% of the copyrighted work was copied? You would say 100% of the copyrighted work was copied? But when you get to the third factor of the proportion of use, that's actually a function of the... You have to look both at the function of the proportion that Dr. Wilder's work made up of Dr. Hoyland's work, which was very substantial, and the proportion that was taken out of Dr. Hoyland's work. But even if it's only 5%... You're saying that the punitive copyright holder is free to define the scope of the work in any fashion that she deems appropriate? Well, I think, again, it goes back to what was registered and what portion of it was focused on. Again, also, this is... It was the sole author, in my hypothetical. Let's say someone copies one paragraph from Chapter 7, and afterwards, the author copyrights only that paragraph. In my hypothetical, would your argument still be the same, that if someone copies that paragraph, they have now copied 100% of the copyrighted work? No, I think that's right, Your Honor. What's right? I wouldn't say that, Your Honor. You would not? That's right. Okay, so let me back out then. Let's say, again, my same 20-chapter book, the person has copied one page of Chapter 7, and only after that copying, the author copyrights only the one page. What would your position be? Do we gauge it by the page, or do we gauge it by the chapter, or do we gauge it by the book? Again, assuming that the same author wrote the whole book. Well, this is going to... I think you would look in that case about what the person copying the work, what that was focusing on. If the person copying the work was essentially only taking and only interested in discussing what was done in that one page, or what was done in that one chapter, then you'd look at it against where the subject matters of the two overlap. But to the extent that the person copying is essentially treating the entire subject matter of the book, then sure, you would only look at the percentage of the book that was taken. So if someone is talking about the entire book and only copies the one page that's copyrighted, how does that play out in your view? Yes, in that case, it would just be the one page. It would be that small percentage. I'm sorry, if you could just maybe spell that out a little bit more. Sure. Is the percentage that we're measuring, would you say that 100% had been copied, or you're saying because the person is talking about the entire book but only copies the one page, that it's more likely to be fair use? Oh no, I think in that case, on balance, that one factor in isolation, no, that would be less. Because if the person copying is only talking about the one page, and only copying the one page, then sure, if she's talking about the entire work, I apologize, that was your hypothetical. If my hypothetical is the person is talking about the entire book, but copies the one page, does that make it more or less likely to be fair use in your view? Less. It's 1% of the entire book, and she's talking about it, that's right. Is less likely to be fair use? On balance, yes, it would be less. But in this case, remember, there are eight different units to this lesson plan. Dr. Hoyland has gone to a conference on learning assessment, which is focusing only on the subject matter of the unit 7H. That's all she's talking about. Doesn't it make a difference that she's using the material for a different purpose than Dr. Wilder? I mean, she is not teaching the course to the people that are before her. She's giving a presentation about what is happening through this project, and how they have innovated the assessment process, and what problems they've had, and what challenges they've overcome with this research grant. It's a different sort of purpose for using the slides. Right. Well, I see that my time has expired, but I will go ahead and answer with the court's indulgence. Essentially, that was what the district court said, but what that ignores the district court said was the teaching of this court in Warhol and then the Supreme Court, which made clear that really not just any new meaning or message or different purpose isn't enough. You really have to have a justification for the use, and that justification is traditionally going to be commenting, criticizing, parodying, taking it and developing entirely new scholarship. That's not what happened here. She just took the words entirely because, hey, this is something I like, but she did no analysis of the work. She didn't comment on it. She didn't criticize it. Thank you, Your Honor. Good morning. Before addressing the specifics of fair use or implied license, I think it is important to simply take a step back with the common sense facts that are at issue here that demonstrate no matter how you analyze it, this is a case that was properly dismissed, and it's not only that it's wrong. It's that it was objectively unreasonable to bring it in the first place. Professor Hoyland was the director of a grant-funded program, a faculty development course. I'm sorry. This is going towards your attorney fee argument? Well, I'm not addressing the attorney. I mentioned the objective unreasonableness, but I'm addressing all of the points. Whatever you focus on, if you could maybe start with fair use. All right. So I will turn to fair use, and we can just start with the transformative aspect of this. As was just mentioned, there's no question that Professor Hoyland did not usurp the original. The original, of course, were instructional materials designed to teach faculty participants about creating assessment tools. These were instructional work that was part of the coursework, and what Professor Hoyland was doing was she was giving a speech. She was giving a presentation about the entirety of the course. These were not assignments to be completed by the attendees. It was not for the attendees to develop their skills. The purpose was to provide an overall arching story about NICE, about the project. That's how she described it. She said there was a larger story she was telling about the entirety of the project, and on this small piece of it, she was giving background about assessment. So she was teaching attendees about the course. She was talking about scholarship. She was talking about some of the results in a manner that was designed to tell community college professors who were not familiar with the course about it. And in this way, it is a classic transformative use, not just a classic transformative use, but one that this court in the recent Hachette case has described as a paradigmatic fair use, as listed in the preamble of Section 107 of the Copyright Act. It references teaching, comment, scholarship, and research, and that's exactly what she was doing. It's a classic example of somebody talking about something else, teaching them about it. And so, of course, like speakers everywhere, yes, did she use one small piece, one very small piece of the program as a fleeting visual aid? Of course she did. This was part of a story to teach people about it, to get their attention, and it was used in the same way that speakers do every day, all the time. Whether they're TED speakers, college professors, that's what you do. You're teaching somebody about it, and it was put up as a brief aid. It's really hard to picture a more transformative use than the one that Professor Hoyland used in this context. But it's worth pointing out that it's even more of that because, yes, it's a transformative purpose, but it arises in a very different context than most fair use decisions because typically it comes up in a context where fair use is being discussed in an effort to excuse what would otherwise be infringing conduct, where there's no license, no permission, no consent. But in this case, there was much more than that because Professor Hoyland was not just speaking in a transformative way in the abstract. She was doing it to comply with the requirements that she had under the grant that they had received. Before you move to, I guess, your implied license argument, if that's what this is, would you be able to address the question I asked your adversary about—I don't know what you want to call it, but let's take my hypothetical of the author who writes a book with 20 chapters and one page or one chapter is copied. He took one view of whether it's more likely or less likely to be a fair use if, say, someone copies just a page from it and only that page had been copyrighted. What's your view on what makes something more or less likely to constitute fair use in that scenario? In that scenario, it is clearly less likely to be fair use. You have—this was a very small piece of eight modules with a number of subparts, and this was one of the subparts. No, I'm sorry, my hypothetical I'm asking you to address, not the facts of this case. If there were the 20-chapter book, someone were to copyright only one page, but they undisputedly authored the entire book. Yes. So the copyright page 86 and 86 is copied in its entirety. Does the fact that only one page was copyrighted and that's what registered for a copyright, does that, in your view, make it more or less likely, or is it not a factor at all in the fair use analysis? It is more likely to be a fair use because what they've done is essentially picked and chose what they wanted to frame it as. So they can take that small portion and say it's 100 percent. But in the context of talking about a large book, if that is the topic that's being discussed, it's actually a minuscule percentage. So your view is that you have to look—when asking what percentage of the work was arguably infringed, you have to look at the totality of what the work is, the overall work that was authored and not just the portion for which registration was obtained? Yes, well, that is correct, but, of course, I think that may depend on the context. But certainly in the context, in this context, where the discussion is about the entirety of it, unquestionably, that is the case. But wasn't your client's presentation focused on assessment specifically? And wasn't that essentially Unit 7? The gist of the overall presentation, as framed, was about assessment. But both as she testified and if one looks at even at the presentation materials themselves, it was a far broader discussion that was occurring there. Yes, there was discussion of assessment, but as she pointed out, she sort of moved right through assessment. She showed the materials. She had a few words written on the materials themselves, giving a couple of comments about how assessment is taught within NICE. But broadly speaking, if you look at the presentation, you can see that it covers quite a bit of material, really the whole project. And her testimony was that's exactly what it was. This was an opportunity for her to speak to educators in the community college context about this topic. And she covered things like how do you get an NSF grant? How does that operate? How do you keep faculty engaged? So it was a much broader discussion, but certainly the topic was assessment. So it was a piece of it for sure. So turning, if I may, I'll turn to the fourth portion, just to skip along as I see my time is starting to run short. There's a question of whether this use, the effect on the potential market, was it a competing substitute? Whether it usurped the market? And the district court wrote correctly that there was little or no effect on the limited market. But that's really a bit of an understatement because common sense was it was no substitute at all. Holland was speaking about these materials, about Dr. Wilder, the materials that Dr. Wilder had written. She was talking about the course, singing its praises, giving information about the course. If anything, it would have had a positive impact on Wilder's work, the way it was talked up. But I think the reality of it is it had no impact at all. There were 20 tops people in this room. It was flashed on the screen, which I think is also an important factor. It went up for a second as a visual aid, and then it was gone. And it had no, at the end of the day, it had no impact on anything. And they attempt to skirt this notion of harm by suggesting that in an academic setting, there's no need to show harm. Well, that's just not true. They're relying on this case Weissman. And in the Weissman case, the circumstances were very different. In the Weissman case, it was two academics. They had worked together on an article. And when they broke apart and were no longer together, the plaintiff wrote additional materials. The other party took those materials, claimed them as her own, and distributed them, not as a visual aid, but as an article that was used in their niche area. And the court found, these were the days before the term transformative use was discussed, but what they said was it was used for the same intrinsic purpose. And because it was used for the same intrinsic purpose, they further stated that it harmed her ability to get the fruits of her labor. It stopped her from having the incentive to do what she did. That's a completely different scenario than we have here. The scenario we have here is there was no impact at all. And this doesn't affect her ability to publish. This is not a scholarly article at all. It's not something that can only be published once and then it's done. If she wants to show other people these works, as she's done before and as she has probably done since, she is welcome to do so. I see that my time has run. Thank you. I'll just address briefly some of those points. Let's start with JA65, the cover of Dr. Hoyland's presentation, and that's Assessing Numeracy in a Faculty Development Program. That is the title page of her work. Dr. Wilder's Unit 7 was about assessing numeracy in a faculty development program. So we think that's the apples to oranges comparison here. Now, we talked a bit about the fourth factor and about the Wiseman case. Let's be clear. You're arguing it's apples to apples, though, right? Yeah, apples to apples to apples, yeah. Okay, I just want to be sure what your view is on the fruit. Sure. Apples to oranges as opposed to apples and baseballs. They're in the same universe, absolutely. Let's talk about the Wiseman case. And first, what the Wiseman case drew on was a case called Marcus v. Raleigh in the Ninth Circuit. And that was a case where there was taking of a portion of a book about cake decoration. The district court specifically found that there was no market effect. The Court of Appeals in the Ninth Circuit said, well, even though there's no market effect, we're finding fair use because there wasn't transformative use. And that's consistent with the doctrine of transformative use. Very ever since Judge LaValle of this court wrote the transformative, if I may, article, essentially creating the transformative use doctrine. And what he said in that article was if there's not a transformative use, that's going to outweigh any lack of market effect, and there's going to be no fair use in that context. Wiseman also, let's be clear, Wiseman, we had the mention of there being distribution. Well, actually what happened was there were 50 copies made, nine of them actually given out to staff, and all of them withdrawn, even before they could get to the students that the curriculum was designed. Nobody even got this thing. But there couldn't possibly have been an actual effect. And the district court, in fact, didn't make any findings on it because it wrongly considered the issue to be financial, and it found there wasn't any monetary effect. The Court of Appeals didn't send it back for further findings. It just said we assume, essentially, that there's harm to the market. Thank you, Your Honor. Thank you both, and we will take it under advisement.